

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*



*Sandra Wilkinson*
*Chief, Major Crimes*
*Sandra.Wilkinson@usdoj.gov*

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4921
MAIN: 410-209-4800
FAX: 410-962-0716

March 7, 2014

Richard B. Bardos
Schulman, Hershfield & Gilden, P.A.
The World Trade Center
401 East Pratt Street
Suite 1800 - 18th Floor
Baltimore, Maryland 21202

Re:   Plea Agreement in the Case of *United States v. Guruvareddy*,
      Criminal No. to be determined.

Dear Mr. Bardos:

1. This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by March 14, 2014, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

2. The Defendant agrees to waive indictment and plead guilty to a Criminal Information charging him with obstruction of a health care fraud investigation in violation of 18 U.S.C. §1518. The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

### Elements of the Offense

3. The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

   a. That the defendant willfully prevented, obstructed, misled, delayed and attempted to prevent, obstruct, mislead, and delay,

   b. the communication of information or records relating to a violation of a federal health care offense to a criminal investigator.

1

## Penalties

4. The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: a maximum sentence of up to give (5) years imprisonment, a maximum fine of up $250,000, and up to one (1) year of supervised release. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked – even on the last day of the term – and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed

## Waiver of Rights

5. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

    a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

    d. The Defendant would have the right to testify in his own defense if he so chose, and

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

2

he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e. If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against his. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

6. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

7. This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

a. The applicable guideline for obstructing a health care fraud investigation is

3

U.S.S.G. §2J1.2. The base offense level is 14.

b. The parties agree that the cross-reference set forth in U.S.S.G. § 2J1.2(c) to the health care fraud guidelines, together with the application of U.S.S.G. § 2X3.1 (Accessory after the Fact), is not greater than that determined in subparagraph a. above.

c. This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

Thus, the adjusted offense level is 12.

8. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

9. This Office and the Defendant agree that, with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures, or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

10. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

### Waiver of Appeal

11. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of

restitution, and term or condition of supervised release.

c. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

12. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement that would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1; (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report; (iii) moves to withdraw his guilty plea; or (iv) commits any offense in violation of federal, state, or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

13. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations

under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

14. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have him sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By: _____
Sandra Wilkinson
Assistant United States Attorney
Catherine S. Pascale
Special Assistant United States Attorney

I have read this agreement, including the Sealed Supplement, and have had it read to me by an interpreter. I have carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

4/10/14
Date

_____
Ramakrishnan Guruvareddy

I am Mr. Guruvareddy's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

4/10/14
Date

_____
Richard Bardos

6

## ATTACHMENT A:
## STIPULATED FACTS – UNITED STATES v. GURUVAREDDY

*If this matter had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The parties agree that the following facts do not encompass all of the facts that would have been proven had this matter proceeded to trial.*

Ramakrishnan Guruvareddy, age 59, is a resident of Belcamp, Maryland. He is a naturalized U.S. citizen. Guruvareddy's native language is Tamil. At all times relevant, Guruvareddy was employed by Pharmacare LLC which, by 2013, was a large pharmacy chain operating in Maryland and other states, owned by Reddy Vijay Annappareddy.

Guruvareddy first came to the United States in 2003. He began his career with Pharmacare in 2007 as a delivery driver and Annappareddy, as the owner, was his direct supervisor. There were only three employees including Guruvareddy and Annappareddy at that time. As the pharmacy chain grew, Guruvareddy's job title and responsibilities changed. He was generally known as the personal assistant to Annappareddy. Guruvareddy was at first paid $7.00 an hour, and then became a salaried employee, earning $48,000 as of approximately 2011.

On October 19, 2009, Annappareddy, who was an H1b visa holder, asked Guruvareddy to sign a letter written to the Department of Homeland Security representing that Annappareddy was "seeking to change to a new job" at Pharmacare as a pharmacist even though Annappareddy was actually the owner of Pharmacare and had been working there for the previous two years. Guruvareddy did not write the letter but he signed it.

In July 2013, Annappareddy and two pharmacy technicians, Vipin Patel and Jigar Patel, were indicted and arrested for health care fraud and aggravated identity theft. The crux of the charges is that the defendants submitted claims for prescription refills, knowing that customers were not requesting or receiving the prescription refills, and then not reversing the claims when the prescription refills were not delivered to, or otherwise received by, the customer.

Between July 25, 2013 and August 28, 2013, the defendant willfully prevented, obstructed, misled, delayed and attempted to prevent, obstruct, mislead, and delay, the communication of information or records relating to a violation of a Federal health care offense to a criminal investigator. Specifically, Guruvareddy concealed and lied about his knowledge of and the location of undelivered prescription medications during the criminal health care investigation of Pharmacare and the defendants.

As a delivery driver, Guruvareddy routinely visited clinics and customer's homes to deliver medications. At times, Guruvareddy would, at the direction of Annappareddy, deliver envelopes containing cash to persons who were customers of Pharmacare, and/or whose own employer had a business relationship with Pharmacare.

At some time in late 2011 or early 2012, the then-compliance officer at Pharmacare complained directly to Annappareddy that there were plastic bins of undelivered medications lying around at the Pharmacare (Caremerica) Old Emmorton Road location (Suite 122).

1

Later that same day, she observed Annappareddy and the defendant remove the filled bins from the premises and place them in their vehicles. The employees at Pharmacare often called these plastic bins of undelivered drugs "Ram's bins" (or totes).

On or about June 14, 2013, an employee referred to herein as "D" who had been interviewed by federal investigators, advised Annappareddy and others about the federal investigation. For a three-day period beginning on or about June 17, 2013, a Pharmacare employee referred to herein as "L" was instructed to begin reversing claims for undelivered medications. Employees began to clean up the pharmacies, including removing expired medications, removing medications that were not stored in drug manufacturers' containers, and removing medications for which insurance companies had been billed, but which medications were never delivered to the recipients and for which the charges were never reversed with the insurance company. Some medications were haphazardly stored in brown boxes marked "donations" that did not have any dates or other paperwork regarding to whom the prescription drugs were being "donated" or when the drugs would expire.

On July 25, 2013, coordinated search warrants were executed at several Pharmacare locations including at Park Heights. Warrants authorized seizure of (1) bins or bags containing medications with dispensing dates prior to June 1, 2013; and (2) drugs not stored in the drug manufacturers' containers, and/or that lack identifying lot numbers or expiration dates. The search team did not find any prescription drugs in bags or bins in the basement of Park Heights. However, as a result of the search warrants, Medicaid and Medicare suspended payments to Pharmacare and the pharmacy chain began winding down operations.

Guruvareddy was first interviewed by investigators on July 25, 2013. The interview took place at Pharmacare's corporate office located at 2701 Washington Boulevard during the execution of a court ordered search and seizure warrant. Guruvareddy told investigators he was familiar with the auto refill practice at Pharmacare. He described how a physician would write an order for refills of a medication for several months and stated that Pharmacare would bill for the medication it each month until all refills were exhausted. Guruvareddy said that if a prescription was unable to be delivered to a customer, the medication would be returned to the store to attempt redelivery at a later date. He denied knowing of any storage locations where Pharmacare maintained or stored medications.

In the beginning of August 2013, Guruvareddy went to visit "H", a Pharmacare employee, who was leaving for India. "H" told Guruvareddy that there were bags of undelivered medications at "Eloise" that needed to be moved. "H"'s reference to "Eloise" was to 1803 Eloise Lane, Edgewood Maryland, a residential townhome owned by Annappareddy's wife, Seeta Kallam that was used by Annappareddy to house Pharmacare employees.

In or about August 2013, the exact date being unknown but approximately 2 weeks before August 27, 2013, Guruvareddy approached "L" on more than one occasion regarding medications at 1803 Eloise Lane. Guruvareddy asked "L" if she would "remove" the undelivered medications from 1803 Eloise Lane. "L" refused. According to "L", Guruvareddy wanted to put the medications back in the pharmacy for the closing inspection of the pharmacies, and he said he needed help with transferring the meds to the pharmacy.

Another Pharmacare employee, "S", told investigators that she knew that undelivered medications had been stored in the basement of the Park Heights Pharmacy and later taken to "Edgewood".

On August 28, 2013, a search warrant was executed at 1803 Eloise Lane and totes and bags full of undelivered medications were found in the home together with driver delivery logs with one book identified as "Extra" signatures. The logs contained pages and pages of alphabetized pages purporting to be patient signatures with no Rx#s or drug names. The house was otherwise empty, having been vacated by Pharmacare employees, to include Jigar Patel, months earlier. Medications not delivered to over 300 patients were contained in the trash bags and totes at Eloise Lane. At least one of the labels contained the date June 6, 2013.

Later that evening (August 28) at approximately 7:00 p.m., Guruvareddy was interviewed by the FBI. Guruvareddy falsely denied knowing about undelivered drugs being stored over time at the pharmacies or anywhere else. He falsely denied ever transporting trash bags of prescription drugs to/from pharmacies and said he had never observed any such trash bags. Even after being advised about the search warrant at Eloise Lane, he lied that he had not been at this property for about a year and denied knowing that any medications were being stored there. He said that he did not have keys to this property but the keys would be maintained with the car keys for the Nissan Versas at the corporate office so anyone would have access to this house key. He falsely denied transporting these bags to this house or asking anyone else to do this.

On January 28, 2014, federal agents served a target letter on Guruvareddy and he agreed to a third interview. On this occasion, Guruvareddy admitted he had lied to investigators previously. Guruvareddy stated that he had driven "H" to 1803 Eloise Lane with two black trash bags full of prescription bags in his back seat sometime in January or February 2013. (He later clarified this to be sometime between between January and March 2013). Guruvareddy said that, prior to January 2013, he had also observed Jigar Patel taking a trash bag containing bubble packs out of the Pharmacare at Plumtree. Guruvareddy later advised investigators that the trash bag was taken to Eloise Lane at a time when Jigar Patel lived there. Guruvareddy believed the returned drugs were from Bon Secours. Guruvareddy admitted that in August 2013, after the search warrant, he asked "L" to take the bags from Eloise Lane back to Caremerica or Plumtree. According to Guruvareddy, Annappareddy did not ask him to move the medications as he had only talked about moving the medications with "H". However, Guruvareddy stated that "H" would only move the undelivered drugs with Annappareddy's knowledge and approval because "if Reddy didn't tell them to do it they won't do it".

Agreed to this 10 day of ~~March~~, 2014:  
April

_____  
Ramakrishnan Guruvareddy

3